Case number 25-3371, NetChoice LLC v. David Yost. Attorney Shreedam for the appellant. Argument not to exceed 15 minutes per side. Good morning. Authorized Shreedam representing Attorney General Dave Yost. I'll be reserving three minutes for rebuttal. All right. Good morning again and may it please the court. This is a case about contracting. Which means asking, whose rights are we talking about? On one side of the contract, the social media side, sure NetChoice has standing to assert their rights, but when it comes to the facial analysis, they're completely sunk. And on the other side of the contract, the children's side, online companies and children's have an obvious conflict in their interests. And that makes standing very hard for NetChoice to get to. But even if it could get past that, it cannot get around the fact that the states have traditionally regulated whether and how children contract since the founding and consistent with the first amendment. Now, I already pointed out why the social media side of the equation is completely absent here. NetChoice made a decision during litigation not to reopen discovery and establish the fulsome record that is necessary to do a mandatory Moody analysis. So when it comes to the social media side as to how the first amendment applies to all of the diverse platforms, features and uses that not just one platform might have, but across all of NetChoice's members. Well, unfortunately, the facial analysis cannot be done. We only have a facial challenge here. So I'm going to turn to the children's side, which is really where NetChoice places all of their eggs in one basket. Before you get too far on that, what's your current position on the standing issue with regard to NetChoice? Are you continuing to contest that? Are you relinquishing that? What's your position as to whether NetChoice has standing here? It has standing to represent the rights of its social media company members, but it does not have standing to represent the rights or pursue the rights of children because their interests are necessarily antagonistic. I can explain that a little further. Social media companies want to contract with children without parental involvement, but children need to have their parents there. And therein lies the open and obvious conflict that makes it impossible for not just one social media company, but an entire association to sufficiently frame the issues children face when it comes to this type of law that regulates their conduct as it pertains to contracting. And so, I mean, I think Newdow creates a perfect example here where if a father cannot assert the First Amendment rights of his daughter there, well, a social media company can't represent the rights of all children, much less an association of all such social media companies. NetChoice would prefer to have this case be tried as two sides of the same rights coin, but that is an illusion. When it comes to the social media company side, standing exists, facial record, gone. But when it comes to the children side, the social media companies have an open and obvious conflict, and it's one that NetChoice just can't get over. And let's add to the fact that prudential standing is already thin as is. Stacking that on top of associational standing, well, I think that stretches Article 3 to its limits. In fact, it might even snap it. And certainly, at least one judge of this court and judges across the country have expressed doubt as to whether such derivative standing is even possible. But it certainly makes the conflicts that I mentioned that much worse and that much more diverse. But even if NetChoice did have standing here to represent the rights of children, they fail at the first step of any First Amendment analysis. And the question comes down to, are we talking about the conduct side or are we talking about some sort of speech regulation? And when it comes to whether Ohio's law touches on any speech, well, it falls clearly on the conduct side because it is textually focused on contracting. The necessary trigger for a social media company to fall within the ambit of Ohio's law is that they want to contract with a child. If that trigger is met, then doesn't the law regulate speech to and by minors? And so if it does, how do you deal with, you know, Supreme Court's cases like Brown or talk about the rights of minors? Well, two answers to that, Your Honor. First, just because speech accompanies a particular conduct, I mean, I'd be hard-pressed to find any conduct that doesn't touch on speech at some point. Even speed limits, as Lichtenstein points out, affect speech in some way. So when it comes to assessing whether there is any First Amendment scrutiny at all versus staying on the conduct side of the line, simple accompaniment of speech is not enough. And I think Macklemore, which was recently decided by this court, gives a powerful example. All of auctioneering is done through speech, but that doesn't mean that in that decision, the court stuck to the conduct side of the line because it was a regulation that addressed harms over and above any particular message that auctioneering conduct would have done. I also want to directly answer the second question Your Honor had posed about why Brown isn't the right way to think about this case. And I understand why at first blush, it might seem as though that's where this court should go. But here are the problems, and there's several. In Brown, the state was unabashed that it was targeting a particular message. It disfavored violent messaging. And there, we're within speech. Whereas if you go back to the Liechtenstein test for what's conduct versus speech, we look to whether the state law is addressing harms over and above disfavoring any particular message. The state was very clear that it was disfavoring violent messaging, was restricting access to violent messages. So that's the first difference. The second difference goes to the fact that Brown is self-limiting. Brown says, had there been a history and tradition of restricting children's access to violent materials, the decision would have come out differently. Or at the very least, the analysis would have come out differently. And here, our entire case is premised on this longstanding history and tradition of states regulating whether and how children contract, especially here with sophisticated companies. And so we clearly fall on the conduct side of the line. So Ohio's law is entitled to rational basis review, and we get no further than that in the analysis, just as this court did in McElmore, Liechtenstein, and there's numerous other cases on the conduct side of the line. Let's assume we disagree with your framing of it as a conduct-based regulation, and we want to apply some level of First Amendment scrutiny. Why are the coverage and exclusion provisions not content-based? A couple of answers to that, Your Honor. First, the coverage provisions are not content-based in that they are defining the regulated community. And now every commercial regulation has to define, make distinctions among various mediums in order to define what the regulated community is. So because this is a conduct restriction, there has to be some level of distinctions that are drawn. And I don't want to say that that is content-based or speaker-based, because we're, again, in commercial conduct restrictions, which means that we're outside of the normal lingo we'd use for speech. But I also want to go directly to the exceptions, Your Honor, which are, I admit they are... Let me stay on the coverage provision. Sure. Because it uses the word subject matter audio content. Yes. Video content. Yes, Your Honor. The coverage provision, I think you're talking about the parts that give examples of what it means to target children or to be reasonably... The 11 factors. Yes, it's 11 factors. They're non-exhaustive factors, and they're meant to provide color for which sorts of companies should be thinking about their contracting with children. And again, as with any commercial regulation, which draws... I mean, take Macklemore, for example. There's a line drawn between licensed auctioneers and unlicensed people who want to. That doesn't mean that that law suddenly draws heightened First Amendment scrutiny. So the various non-exhaustive factors are simply meant to provide guidance for which operators should be looking hard at whether and how they contract with children. I wanted to hear what you said about the exclusions, too. Of course, Your Honor. Those exceptions are certainly content-based. But that doesn't render the entire law content-based for the purpose of heightened First Amendment scrutiny. And I'll explain why. For one thing, I'm hard-pressed to think of an example where a operator both is an operator within the meaning of Ohio law and needs to avail itself of the exceptions, largely because the exceptions don't target the types of social networking features, like friending features, that would bring a social media operator into the ambit of Ohio's law. And in that sense, I would call the exceptions confirmatory of the scope of Ohio's law. And I want to draw a line to a similar discussion in the Paxton decision, Your Honor, where there were several exceptions. In fact, social media companies were excluded from the age verification law there. And the court explained why, first of all, there's no freestanding under-inclusiveness inquiry in the First Amendment. But more important, it explained that those exceptions could hardly be made use of, because they provided confirmation of the types of companies that fall within the scope of the law issued there. You're saying the AG would not need to really engage with these provisions? Yes, Your Honor. In fact, I think, again, I have a slim record here, but the way I see it, it's probably a null set of companies that need to avail themselves of those exceptions. And Ohio law has a presumption towards severability, something that wasn't discussed by the court below. To the extent this court believes the exceptions are the ones that are causing the problem, severing them would be one way of addressing that, although I don't think it's really necessary. We're being asked on appeal to review both summary judgment as well as granting of an injunction. If we separate those two things, as to the injunction part of the appeal, I guess the argument would be that, maybe from your perspective, that enforcement of the statute was not imminent, and on that basis alone, the injunction was not available to be granted. Would that be a correct statement, in that over the course of a year, the state's not taken action to enforce the statute? Well, Your Honor, we're under injunction. Ohio law is enjoined right now, so we wouldn't be able to enforce it. And certainly it's causing harms to all of the children who continue to contract with these social media companies and suffer the harms associated with them. Going to your imminence point, Your Honor, we certainly intend to enforce the statute if the injunction weren't in our way. I see I'm out of time. I hope I answered Your Honor's question, but I'll reserve the rest of my time for it. Thank you. Good morning, Your Honors, and may it please the Court, Erin Murphy on behalf of NetChoice. The District Court correctly concluded that Ohio's law violates the First Amendment. As the Supreme Court reiterated just this past term in the Paxton case, laws that restrict access to protected speech implicate the First Amendment, and that's true even if the law does not   if they restrict access by preventing people from engaging in contracts that are essential and integral to engaging in speech. And Ohio's law actually restricts far more protected speech than the law that was at issue in the Paxton case, as the bulk of the speech on the services covered here is protected not just as it was there as to adults, but as to the very minors whose access to speech this law is restricting. The District Court also correctly concluded that the law is subject to strict scrutiny as both its operative provision and its exceptions are content-based. I don't even think the state has argued that it could survive strict scrutiny, but even if you were to apply intermediate scrutiny, this is classic law that just burdens far too much speech while accomplishing far too little of the state's asserted interests. Do you agree with your opponent that this is a facial challenge only? We prevailed on a facial challenge, so that's what's on review before the Court at this point. And we think that's correct because this is a law that implicates speech in all of its applications. And I would like to take a minute to explain why that's different, why this law is different from the laws that were at issue in Moody. The laws that were at issue in Moody were laws that didn't restrict users' access to the services. They instead imposed restrictions only on the services, saying essentially you have to allow certain people to use your services even if you don't want to. You can't speak over your own objections or present speech in certain ways over your own objections. And so in those cases, the First Amendment interest that was front and center was not the interest of the users because that wasn't what was being restricted. It was the interest of the services. That's why the Court was focused on the services in Moody. It was a product of the laws that were at issue there. And that's just not really, I mean we of course argue about issues about third party standing for Net Choice to be bringing a First Amendment claim. But it's why I think this kind of facial challenge Moody dynamic is really a red herring in this case because in this case, the reason this law implicates the First Amendment in all of its applications is because the covered operator provision tells you it applies only to services. So it's almost like an umbrella. Once that coverage and the exemptions, if you want to look at that too, if we say that's content based, and the users, even if you thought there was some service within Net Choice that wasn't itself engaging in First Amendment activity, the definition here tells you the users always will be because the only services covered here are services where you interact socially and post and create content for other users to see. So the law is always going to implicate the First Amendment. That's why the District Court was correct to say I don't have to resolve every dispute there might be about whether it's the service side and the user side because there's always a First Amendment interest by virtue of the way this law is structured on the user side. And that's what makes this law different from the laws at issue in Moody. What's your best case to show you can stack standing? Sure. So I actually resist the proposition that we're relying on third party standing in the way that the state has suggested. So you look at a case like Newdow or some of the other cases the state is invoking. Those are cases where the court said the plaintiff didn't have standing and they were asserting. So they were relying on the interest of a third party to say I don't have a First Amendment claim but you do and I think I should be able to come into court and assert your First Amendment claim. That's not what we have done in this case. We have First Amendment standing ourselves. Net Choice has members who have First Amendment interests and while I'm sure the state would tell you it doesn't think that all of Net Choice's covered members have First Amendment interests for purposes of standing that doesn't matter. The majority of our covered members are engaged in First Amendment activity and we know at least some of them are because the covered services here include Facebook and YouTube which are the precise services that the Supreme Court held in Moody are engaged in First Amendment activity when they disseminate speech to their users. So we have First Amendment standing in our own right. The reason we've asserted the interest of users is the same reason that the plaintiff which was an association in Brown, an association of merchants asserted those interests. It's because it's part of the substantive First Amendment standard here. The question under First Amendment law is whether you're applying intermediate or strict scrutiny whether the law burdens more speech than is necessary to accomplish the state's asserted interests. A court can't answer that question without asking how much speech does this law restrict? What access does it impede? So we really asserted the interest of users not in a third party standing sense where we're saying we can't get into court ourselves but let us come in and essentially be like the agents of these users. It's just part of our First Amendment argument because it's a facial challenge. And to pick at this a little bit more on the remedy side if you successfully have gotten an injunction if we were to affirm that does it matter whether that's applying to you or to also users? No, which is precisely why we didn't seek any relief vis-a-vis users. We sought an injunction as to our members that this can't be applied as to our members. That's going to inure to the benefit of users because that's inherent in how First Amendment doctrine works when you have a law like this one that is essentially conscripting us into restricting the First Amendment rights of our users. If we get relief that means our users get relief but the injunction we sought was not that you can't apply it vis-a-vis particular users but the covered services that are NetChoice members. And I think that just underscores why this really is just kind of a red herring in this particular case and I would say in a number of our cases that we've brought challenging these types of laws because when you have an access restriction the law necessarily implicates the user rights and the service rights so we have our own First Amendment interests and really aren't asserting traditional third party standing. Is that true in the Sellers case? I didn't mean to interrupt you but I don't know when you're going to pause. Sure. But just to make sure I understand your argument about standing it's the argument that NetChoice has Article 3 standing in and of itself and that's what we should evaluate in terms of your bringing of an action that involves the interests of third parties. Or is it that NetChoice has associational standard and that it can raise third party claims attached to the rights and interests of its members because some of the cases in this area seem to differentiate between Article 3 standing and associational standing. Sure. I don't think the state I mean I can be corrected on rebuttal if I'm wrong but I don't think that anybody disputes here that we have both Article 3 standing and associational standing to represent NetChoice's members. I think the only thing the state is disputing is whether we also have prudential standing to assert the interests of minor users who would like to use our services. And what I was engaging with Judge Ritz is that we aren't really asserting third parties standing in the way that if you look at some of the other cases is going on. I mean don't get me wrong we think we easily satisfy the test for asserting the rights of third party users of services. The American booksellers case says that the booksellers were free to represent the interests of the book buyers. But my point is our case is actually even easier than that one because the Supreme Court in the American booksellers case actually reserved judgment on whether the booksellers had any First Amendment interest or rights of their own. So the Supreme Court said even assuming that the booksellers had no First Amendment rights and no ability to bring a First Amendment claim of their own we do have our own First Amendment rights and our own First Amendment standing to be bringing this challenge. So I don't think anybody disputes Article 3 standing. I don't think anyone disputes associational standing. I think the only dispute is about this prudential standing issue that we think is really actually ultimately a red herring in this case. Do I understand correctly recently I know there's a new case every week in this area but the 9th Circuit and the 11th Circuit went out of the court's way? I don't know. On this question Uthmeyer went our way. Nobody challenged whether we had standing and could bring a facial challenge. Did not go our way on the ultimate merits. That's a state panel decision that's not even binding in the 11th Circuit. I understand. How are those laws different than what we have? Sure. So the Uthmeyer one in particular the 11th Circuit there went out of its way to note that it was relying on language in that statute that it distinguished the other statutes. I want to be careful here because I represent NetChoice in that case and we think they got it wrong. But that law doesn't have the kind of content based exceptions that you have here. Things like focusing on traditional media outlets or look at the content of the service to ask whether it targets children. It's structured really differently because it focuses on whether you have particular features on the service. And that it thought it was not suggesting that its opinion would necessarily apply to any of the other cases and that it thought it was distinguishable precisely because the language of that statute is quite different from here. And the California statute it's kind of different in lots of different respects than the one here. Algorithm focused. Yeah. It's just it regulates differently. It's got a whole different kind of structure. And so I don't think it falls there's kind of a universe of laws that Ohio's, Tennessee's that we'll talk about a little earlier this morning look a little more similar to each other and the two laws at issue in those case really don't. So I think while I'm certainly not suggesting we think those courts got it right I don't think that they are particularly relevant here and because we do have a content based law. Before I get to that I do want to briefly respond to we heard a lot from the state this morning about the idea that this is a restriction on conduct. I mean the very cases the principle case they're relying on Lichtenstein has a lengthy discussion about how if it is conduct that's essential to the creation of speech that's integral to the speech then the rule about it being a conduct based regulation doesn't apply. That's a rule that applies only when you have a law that impacts First Amendment activity only completely incidentally to an effort to regulate conduct that's not related to the First Amendment whereas here it's really the regulation of account creation that is incidental to the state's ultimate goal of preventing minors from using these services and we know that because the law specifically says that if you don't get parental consent it's not you can't enter into an account agreement with the minor you have to prevent the minor from accessing or using the service. That's what this law is all about. That's why there's arguments in the regulations it submitted about why it thinks not just that there's some problem with the terms of service attached to whatever types of account creation procedures different services might have there are arguments about we're worried about minors using these services we're worried about the content they'll see we're worried about how much time they'll spend on those that is not a regulation of conduct that incidentally impacts speech or restrict access to speech. So we think the statistical court was absolutely right to say this law implicates the First Amendment and it gets strict scrutiny because you have a clearly content-based set of exemptions this special exemption for widely recognized and traditional media sources is obviously content-based and when the state says well don't worry about that because our definition will already ensure that they're not covered that's just an admission that the definition itself is content-based. It says to determine whether a service targets children or is reasonably likely to be accessed by children and the number one the very first thing on the list of criteria that the Attorney General is supposed to consider in answering that question is the subject matter content-based distinction as are the exceptions and of course we also think there's a content-based problem with focusing on this idea that social interaction is somehow less valuable or more concerning than interaction where you're commenting on an article by the New York Times or reviewing a product that is provided on e-commerce. What about the argument that if there's an alleged protection because the Attorney General is supposed to investigate before taking an action and the Attorney General is required under the statute to give notice so before seeking the imposition of penalties or injunction so that there's an opportunity to respond before any alleged damaging consequences could arise? Sure, so the provision in Ohio's law is a little different from the one we'll talk about later today with Tennessee's law that has a 10-day notice requirement across the board. Ohio actually has a notice requirement only if it's already concluded that you are in compliance with the law so if it thinks that a company is not in compliance with the law it's not obligated to go through any notice procedures. It can just bring suit now and I think we basically heard the state say today that but for an injunction they'd like to start suing our members so I don't think there's any concern here that we don't need injunctive relief or that there's not a real risk that without it the state would enforce this law.  Thank you. Unless there's any further questions we'd ask you to affirm. Thank you. Alright. Well, we survived a lot of traffic this morning but I could barely stop myself from getting T-boned on the standing analysis that my opposing counsel did today. For standing she focuses on the members and then for the merits she focuses on the users. That's a clear mismatch, Your Honor and it's the kind of mismatch that a new Dow style analysis would be able to suss out and point out that an obvious conflict of the sort that the social media companies have with the children's interests well, that's the kind of situation in which third-party standing is not available to press the rights of children. Now, if I'm not careful she'll also speed past the fact that when it comes to facial challenges in the Moody analysis that is mandatory and when it comes to the variety of platforms and features and users focusing on Moody's content moderation law does not get her past what we need in terms of a Moody analysis and that's been confirmed by another case in the Sixth   which talks in a separate context about the importance of understanding the legitimate sweep against the illegitimate sweep of the law especially when it pertains to online companies because take Facebook as an example even within Facebook you have a messenger application in which Facebook treats it as a conduit you have the marketplace which is mostly commercial speech and last you have the main page itself which could be considered curative and expressive content I'm going off of my understanding of Facebook and some of the discussion in Moody but if you take the fact that there's diversity just in that platform and then multiply that across the diversity across all of the platforms well that's why the Moody analysis is mandatory and that is confirmed by  we can't just breeze past that because it's convenient and to the extent that the  question is   coverage provision is content based subject to strict scrutiny and does not survive are there constitutional applications left because doesn't that provision tell us who's in the bucket that we're regulating that's certainly correct that it tells this  who the regulator party is but that doesn't change the fact we heard a lot about red herrings this morning the coverage is the red herring here because the actual action is the red       this morning I heard no repudiation of the fact that states have long regulated whether and how children contract specifically because they're not capable of                             children